IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

J.G., a minor disabled child,
by and through his mother, Wendy Koss,

                              Plaintiff,

       v.

T. BRANDON LINGLE,
SUN PRAIRIE POLICE DEPARTMENT,
CITY OF SUN PRAIRIE,
MAYOR JOHN MURRAY, in his official capacity
and CHIEF OF POLICE PATRICK ANHALT,
in his official capacity,

                           Defendants.

OPINION AND ORDER

13-cv-414-slc

In this civil lawsuit brought pursuant to 42 U.S.C. § 1983, plaintiff J.G. contends that defendant Officer T. Brandon Lingle violated his right to be free from excessive force under the Fourth and Fourteenth Amendments when Officer Lingle allegedly grabbed J.G. and slammed him to the floor at the Cardinal Heights Middle School in Sun Prairie, Wisconsin.  In addition, J.G. has brought a claim pursuant to *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), alleging that defendants Patrick Anhalt's and John Murray's failure to investigate the incident and discipline Officer Lingle shows that the City of Sun Prairie has a policy and practice of permitting its police officers to engage in unwarranted and unprovoked physical assaults on minor disabled children.  J.G. also had named the Sun Prairie Police Department as a defendant, but he has withdrawn those claims because he concedes that the department is not a suable entity.  *See* dkt. 50 at 34.

Before the court is defendants' motion for summary judgment in which defendants contend that J.G. has insufficient evidence to prevail on his excessive force and *Monell* claims, and that Officer Lingle is entitled to qualified immunity.  Dkt. 21.

I am denying defendants' motion for summary judgment with respect to the excessive force claim against Officer Lingle and on Officer Lingle's claim of qualified immunity because there are genuine issues of fact related to whether and to what extent J.G. posed a threat to Officer Lingle or others at the time of the incident, the amount of force used by Officer Lingle and the cause of J.G.'s injuries.  With respect to J.G.'s *Monell* claims, I find that J.G. has failed to adduce sufficient evidence from which a jury could conclude that the city had a custom or practice of allowing excessive force.  As a result, defendants City of Sun Prairie, Chief Anhalt and Mayor Murray are entitled to summary judgment and will be dismissed from this case.

PRELIMINARY MATTERS

First, defendants have raised several objections to J.G.'s proposed findings of fact (PFOF) and his responses to defendants' PFOF in which J.G. relies on the expert opinion of Dr. Christopher Chapman.  Defendants object to J.G.'s PFOF No. 79 on the ground that it spans more than eight pages and restates the full opinion of Dr. Chapman, who reaches several legal conclusions that are within the purview of the court.  This eight-page proposed finding of fact violates this court's summary judgment procedure requirement that "[e]ach fact must be proposed in a separate, numbered paragraph, limited as nearly as possible to a single factual proposition," dkt. 10, § I.B.1 *Proc. to be Followed on Mots. For Summ. Judg.*, at p. 5.  Defendants also correctly note that J.G. may not rely on Dr. Chapman's opinion to establish what happened during the incident between Officer Lingle and J.G. because Dr. Chapman was not present and he has no personal knowledge of the incident apart from watching the security video, which speaks for itself.  It is unnecessary to address defendants' hearsay objection to J.G.'s PFOF Nos.

2

72 through 78 related to Dr. Chapman's credentials because those facts are irrelevant and not helpful to my decision on defendants' motion.

Defendants also challenge J.G.'s use of the affidavit of his mother, Wendy Koss, who describes incidents that occurred at school while she was not present.  I agree that Koss may not testify about any event on which she does not have personal knowledge. Fed. R. Civ. P. 56(c)(4) (affidavit used to oppose motion for summary judgment must be made on personal knowledge). To the extent that J.G.'s PFOF or responses to defendants' PFOF rely solely on such evidence, the court will disregard them.  Defendants also object to a few statements in Koss's affidavit that they say either conflict with her earlier deposition testimony or contain false information. However, it is unnecessary to consider these objections because the allegedly false statements were not relevant to any decision that I reached in ruling on defendants' motion.

Finally, defendants contend that J.G. cannot proceed on claims against them for failure to train or supervise Officer Lingle because J.G. did not allege such claims in his complaint or move to amend his complaint to add these claims.  I agree.  Although J.G. generally references Chapman's opinions regarding Officer Lingle's lack of proper training in his response brief, he alleged in his complaint only that defendants failed to investigate the incident and failed to discipline Officer Lingle properly.  Further, J.G. has not developed an argument supported by admissible evidence with respect to a separate claim that the mayor, police chief or the city failed to train or supervise Officer Lingle.  As a result, I have disregarded any allegations and proposed findings of fact related to a failure to supervise or train Officer Lingle.

UNDISPUTED FACTS

For the purpose of deciding defendants' motion for summary judgment, I find from the parties' submissions that the facts set out below are material and undisputed.

## I.  The Parties

Plaintiff J.G. is a 14-year old boy who lives with his mother, Wendy Koss, in the City of Sun Prairie, Wisconsin.  J.G. has learning and emotional disabilities. J.G. is in the eighth percentile for expressive verbal ability, which means that he is barely able to express himself. J.G.'s pragmatic language skills are less than the first percentile, which is the lowest that one can score unless the person is non-responsive.  As a result, J.G. is eligible for and receives special education from the Sun Prairie School District at Cardinal Heights Middle School (CHUMS), which serves eighth and ninth grade students.

J.G.'s individualized education program (IEP), which was in effect on February 14, 2013, calls for the use of "nonviolent crisis intervention."  The IEP includes a behavior intervention plan (BIP), which anticipates that J.G. would have problems following directions, staying in his designated classroom and treating property and materials with respect when frustrated, angry or upset.  J.G.'s BIP further stated that when J.G. was upset, it was best to refrain from verbal interactions with him, leave him alone and walk away.[1]

---

[1] Although there are several undisputed facts concerning the contents of J.G.'s IEP and the nature of his disability, J.G. has not adduced any evidence showing that Officer Lingle knew about the IEP, had access to it or was responsible for implementing it.  *McDonald by McDonald v. Haskins*, 966 F.2d 292, 293 (7th Cir. 1992) ("Our inquiry looks to 'whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them.'").  Therefore, except for background purposes, J.G.'s IEP is largely irrelevant in this case.

Defendant T. Brandon Lingle is a police officer working for the Sun Prairie Police Department and serves as a police school liaison officer in the Sun Prairie School District. He has an office at CHUMS and spends part of his work days at one of the three Sun Prairie public middle schools. In that role, Officer Lingle ensures the safety of staff and students when possible, patrols the hallways, enforces the laws and listens to complaints. At all times, Officer Lingle acts a police officer and law enforcement official at CHUMS.

Defendant City of Sun Prairie is a municipality in Dane County, Wisconsin. At times relevant to this lawsuit, defendant John Murray was the mayor of the City of Sun Prairie and defendant Patrick Anhalt was the chief of police of the Sun Prairie Police Department. Neither Mayor Murray nor Police Chief Patrick Anhalt was present at CHUMS at any time during Officer Lingle's February 14, 2013 encounter with J.G.

## II.  J.G.'s Behavioral History

After J.G. started attending school in Sun Prairie, his mother received phone calls from the school because J.G. became aggressive or uncooperative when upset. Some examples of J.G.'s behavior include:  using keys on a lanyard to injure a school staff member, striking a school staff member several times until she sustained injuries, destroying a classroom, spitting on a staff member, leaving the classroom and school building without permission, damaging school property (including a computer/monitor and teacher's book), biting and injuring school staff members, becoming so aggressive that the school had to shut down a hallway, throwing books,

pens and pencils to the ground at inappropriate times and calling students, teachers and the bus driver "whore," "dumb slut" and "hooker."[2]

Officer Lingle has known J.G. for approximately three school years and was aware of the above-noted behavioral incidents at school because they were documented by the school and in police reports.  He also knew that J.G. had several arrests from Sun Prairie Police Department, and that police department records indicated that J.G. had the caution flag "Person Officer Safety," which indicates a history of violence and that the officer should take caution when dealing with him.  Over the years, Officer Lingle developed an excellent rapport with J.G.; Officer Lingle often was able to calm J.G. and help prevent violent episodes by talking with him.

Jessica Clark, a special education teacher, was J.G.'s teacher during the 2012-2013 school year.  At the beginning of that year, Officer Lingle met with Clark and informed her about the rapport he had with J.G.  On more than one occasion throughout the year, Clark called Officer Lingle to her classroom when J.G. got out of control.

## III.  The February 13, 2013 Incident

At approximately 1:30 p.m. on February 13, 2013, Clark called Officer Lingle to Door 24 of the school and informed him that J.G. had left the building and would not come inside. When he arrived, Officer Lingle found Clark and J.G. directly outside Door 24; J.G. was on top of a snow bank.  Officer Lingle told J.G. it was too cold outside and asked him to come in so they could talk.

---

[2] The parties dispute whether J.G. also was involved in other incidents, including slamming a teacher's hand in a door and using a pair of scissors in an aggressive manner.

J.G. told Officer Lingle that he was not coming in and wanted to be left alone. Officer Lingle told J.G. that he needed to stop kicking snow at a car and come in. Officer Lingle also advised J.G. that if he did not come in, then he would be in violation of the unauthorized presence on school grounds ordinance. Officer Lingle continued by telling J.G. that he would have to arrest him and make him come in. J.G. slowly but surely came into the building and he was able to calm himself as they spoke.

## IV. The February 14, 2013 Incident

### A. The Initial Encounter

At approximately 8:30 a.m. on February 14, 2013, Officer Lingle, dressed in full uniform, was sitting in his office at CHUMS when he received a call from Clark. Clark informed Officer Lingle that J.G. was ripping up the personal items in his cubby and had placed a pencil holder on the ground and was smashing it continuously with his foot. J.G. also had gone to his locker in the hall outside the classroom to collect some items and had brought them into the classroom to pack his backpack as if he was going to leave the building.

As Officer Lingle walked toward Clark's classroom, he saw J.G. walking down the hallway toward him. From this point forward, the entire incident in the hallway lasted less than two minutes and was recorded by the school's security camera without audio.

As Officer Lingle approached J.G., he could tell that J.G. had a very red face and looked extremely upset. Officer Lingle began walking with J.G. and asked him what the matter was. J.G. said that he "was walking to his class" and told Officer Lingle to "leave me alone." Soon after this, the first hour classes released and approximately 500 students were moving in between

7

classes in and around that section of the building.  J.G. continued walking, so Officer Lingle stepped in front of him and asked him to stop.  When J.G. tried to walk past him, Officer Lingle put his own hand against the wall and put his other hand on J.G.'s shoulder and said something like, "buddy, wait."  Officer Lingle told J.G. that he had learned that J.G. damaged some property and caused a disturbance in his classroom.  He also told J.G. that he needed to speak with Clark to see what had happened.  Officer Lingle could see that Clark was coming toward them down the hallway, so he told J.G. to wait so he could talk to her.[3]  J.G. responded that "I am not going to listen to you.  I just want to go to class."  As Officer Lingle asked J.G. to stay for a minute, he placed what he intended to be a friendly hand on J.G.'s shoulder to try and comfort J.G.  Officer Lingle knew from his past experiences with J.G. that he could be violent, so Officer Lingle did not want him going into his next class while he was still mad.

When Clark arrived, Officer Lingle asked her what happened.  She told Officer Lingle that J.G. had been working on a project and had become upset and started to tear it up.  Clark let J.G. do this; when he was done, he started a new project.  J.G. then got upset again and started to tear up the second project.  Clark told Officer Lingle that J.G. threw the item in the trash and walked to his cubby in the classroom where he keeps his school materials.  J.G. tore his name tag off the cubby and got a pair of scissors.  J.G. then began cutting up stuff and throwing it in the trash.[4]  Although J.G. did not threaten Clark verbally or physically on February 14, 2013, Clark informed Officer Lingle that J.G. was scaring her when he was using the scissors.  Clark told Officer Lingle that when she told J.G. to stop, he began to pack his

---

[3] During the whole encounter between Officer Lingle and J.G., Clark stood about four feet from them and had a clear view of when they met up and could hear their entire conversation.

[4] Clark did not tell Officer Lingle at that time that J.G. was cutting up his own things.

backpack.  Clark stated that after she had called Officer Lingle, J.G. left the classroom five minutes before class was over, threw his backpack, helmet and jacket against his locker in the hallway and started to walk away.  Clark reported that she followed J.G. until he encountered Officer Lingle in the hallway.

Officer Lingle asked Clark what J.G. needed to do to fix the problem.  She stated that J.G. needed to clean the mess he made in her classroom and cool down before going to his next class. Officer Lingle asked J.G. to walk back to the classroom so they could fix the issue.  J.G. stated, "I am not going or doing what you tell me."  Officer Lingle asked again, and J.G. again stated, "I am not doing anything you tell me."  J.G. had a cell phone in his left hand and said that "I am going to call my mom."  Officer Lingle told him that was fine as long as he was moving toward the classroom.  J.G. did not follow Officer Lingle's instructions.

### B.  Officer Lingle's Use of Physical Force

Up to this point, Officer Lingle was simply talking to J.G. in an effort to persuade J.G. to return to the classroom. Officer Lingle wanted to get L.G. out of the hallway and begin his investigation.  This effort failed and J.G. would not comply.  Officer Lingle then initiated physical contact with J.G. to establish control of the situation.

J.G. had a cell phone in his left hand and announced that "I am going to call my mom."[5] Officer Lingle told him that was fine as long as he was moving toward Clark's classroom.  J.G. did not follow the instruction, so Officer Lingle placed his right hand on J.G.'s right arm and asked him to move.

---

[5] Although there is some evidence that school officials had agreed in the IEP process that J.G. could call his mother on his cell phone when he was upset, Officer Lingle apparently did not know this. Otherwise, students were allowed to use their cell phones only in the hallways between classes.

From this point forward, the parties offer diametric characterizations of what happened. Officer Lingle avers that the situation was spinning out of control and that J.G. was trying to strike him. J.G. counters by pointing to the video recording of the incident shot from a wall-mounted camera bout 40 feet down the hall. Although the grainy video is not entirely clear, it places Officer Lingle's version of events in dispute.

The parties agree on these facts: J.G. made a motion with his arm and his hand came close to Officer Lingle's face. Officer Lingle stepped in closer and warned J.G. in a strong voice not to yank away from him and to get moving again. J.G. turned, stated "no" and put his back to the wall and started to call his mother. When Officer Lingle again asked him to move, J.G. responded "no." Officer Lingle took the phone from J.G. and stuck it in the back of his own belt. J.G. then said "Give me my fucking phone back." J.G.'s became redder and he was clenching his jaw, tightening his fists and giving Officer Lingle a hard stare. J.G. said "Don't fucking touch me and give me my fucking phone now." Officer Lingle placed both his hands on the inside of J.G.'s elbows and said they had to go. When Officer Lingle attempted to turn J.G. away from him,[6] J.G. tensed and raised his right arm and hand.[7] Officer Lingle directed J.G. to "stop resisting" and he placed J.G.'s hand behind J.G.'s back. J.G. continued to tense up and tried to move away. Officer Lingle told J.G. to "get on the ground." J.G. again tensed up and tried to pull away. During this exchange, J.G. was yelling "get the fuck off me."[8]

---

[6] Officer Lingle explains that this was to prevent J.G. from punching him. J.G. disputes that this was a valid concern.

[7] The parties dispute how to characterize this motion. The video is not clear enough to allow the court to conclude whether J.G. was trying to strike Officer Lingle or attempting to pull away from his grasp.

[8] Officer Lingle claims that J.G. was flailing his left arm. This is not clear on the video.

As shown on the grainy video, Officer Lingle used his right hand to grasp J.G.'s right arm below the elbow, then he put his left hand on J.G.'s right shoulder blade and directed J.G. down to his knees.  Then, J.G. either is pushed or flops further down so that his left shoulder is on the floor and the left side of his face is on or near the floor.[9]  Officer Lingle straddled J.G. near J.G.'s waist, his right knee and his left foot on the ground.  Officer Lingle leaned over J.G. and said in a strong voice, "stop" and "I am the police." Officer Lingle told J.G. that he needed to listen. Officer Lingle held J.G. still for a moment while J.G. calmed down.  Officer Lingle then directed J.G. to get up.  J.G. did not move while Officer Lingle tried to help him up, so Officer Lingle again directed him to get up.  J.G. and Officer Lingle then were able to rise and walk toward Officer Lingle's office.  When J.G. got up from the floor, he had bruising under his eye.

Officer Lingle did not handcuff J.G. because J.G. wasn't exhibiting aggressive or assaultive behavior.  As they entered the office, Officer Lingle asked J.G. if he would listen if Officer Lingle let him go.  J.G. said yes, and Officer Lingle let go of his hands.  As J.G. sat down, Officer Lingle noticed that J.G.'s right eye had swollen up.  Officer Lingle called the nurse to check out J.G.'s eye and evaluate him.

Officer Lingle issued J.G. a municipal ordinance citation for disorderly conduct, Wis. Stat. § 947.01, and a citation for resisting arrest, Wis. Stat. § 946.41.  J.G. pleaded "no contest" to the disorderly conduct charge and the resisting arrest charge was dropped.

---

[9] The parties dispute whether J.G.'s head hit the floor during this takedown.  As J.G.'s head approaches the floor, the camera is blocked by a student walking up the hallway.

## V. The Police Department's Investigation

The Sun Prairie Police Department reviews every incident in an officer uses force.  It is standard for such investigations to involve multiple layers.  On February 14, 2013, Lieutenant Kevin Konopacki sent an email to Police Chief Patrick Anhalt and Assistant Chief Scott Faust, notifying them of the incident with J.G. and the fact that the department would be investigating Officer Lingle's use of force.

Following the incident at the school, Officer Lingle called his supervisor, Sergeant Brenda Dahlen.  After J.G.'s mother, Wendy Koss, verbally complained about what happened, Sgt. Dahlen went to the school, viewed the video of the incident and spoke with Officer Lingle, school staff, Koss and Clark.  Sgt. Dahlen asked the assistant principal at CHUMS to gather other students who were walking through the hallway and might have witnessed it.  Sgt. Dahlen based her investigation on her observations, the video and the accounts provided by Officer Lingle and Clark.  On March 8, 2013, Sgt. Dahlen presented her findings in a memo to the supervising officer, Lt. Konopacki.  Sgt. Dahlen concluded that Officer Lingle had acted within department guidelines, had used only the amount of force necessary to control the situation and had not intended to injure J.G.

After reviewing the incident, Lt. Konopacki also concluded that Officer Lingle had used only necessary force during the incident.  Assistant Chief Faust accepted and agreed with Lt. Konapacki's investigation and conclusion.

Officer Lingle's supervisors asked two Defense and Arrest Tactics ("DAAT") Instructors, Officer Todd Lukens and Sgt. Ryan Cox, to review Officer Lingle's use of force report.  Both instructors concluded that Officer Lingle's use of force on J.G. was appropriate and necessary.

The Sun Prairie Police Department does not have a mechanism that would trigger a collective review of multiple incidents of use of force by the same officer for the purpose of determining whether that officer has pattern of using excessive force. On March 13, 2013, the Sun Prairie Area School District Executive Director of Student Services, Jennifer Apodaca, emailed Asst. Chief Faust to seek a meeting with the police department to discuss the incident between Officer Lingle and J.G. Apodaca expressed her concern that Officer Lingle had taken three eighth graders to the ground at CHUMS in the last month. Faust was not concerned because all three incidents had been investigated and found not to have involved an excessive use of force. During Anhalt's tenure as the police chief since 2009, the department has investigated between 30 and 50 uses of force. Only one incident involving a vehicle pursuit by Konopacki was found to involve excessive use of force. Konopacki was suspended for three days because of the incident.

## OPINION

### I. Summary Judgment Standard

Summary judgment is proper where there is no showing of a genuine issue of material fact in the pleadings, depositions, answers to interrogatories, admissions and affidavits, and where the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "'A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party.'" *Sides v. City of Champaign*, 496 F.3d 820, 826 (7th Cir. 2007) (quoting *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005)). In determining whether a genuine issue of material facts exists, the court must construe all facts in favor of the nonmoving party. *Squibb v. Memorial Medical Center*, 497 F.3d 775, 780

(7th Cir. 2007). Even so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, he must come forward with enough evidence on each of the elements of his claim to show that a reasonable jury could find in his favor. *Borello v. Allison*, 446 F.3d 742, 748 (7th Cir. 2006); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).

## II. Officer Lingle's Use of Force

A claim that a law enforcement officer has used excessive force in the course of an investigative stop or other seizure is analyzed under the Fourth Amendment and its reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989); *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010) (under Fourth Amendment, officer's use of force must be reasonable under the circumstances). "An officer's use of force is unreasonable from a constitutional point of view only if, 'judging from the totality of circumstances at the time of the arrest, the officer used greater force than was reasonably necessary.'" *Gonzalez v. City of Elgin*, 578 F.3d 526, 539 (7th Cir. 2009) (quotation omitted). The nature and extent of force that may reasonably be used to effectuate an arrest depends on the specific circumstances of the seizure, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting [seizure] or attempting to evade [seizure] by flight." *Graham*, 490 U.S. at 396. The constitutional inquiry is objective and does not take into account the motives or intent of the individual officers.[10] *Id.* at 397.

---

[10] Therefore, the evidence J.G. points to about Officer Lingle feeling bad about J.G.'s injuries is irrelevant to the excessive force inquiry.

Defendants contend that once J.G. "became physically violent and obstructionist, swinging his hand twice at Officer Lingle, Officer Lingle was justified in taking him to the ground to control him." Dkt. 22 at 12. To refute Officer Lingle's version of the events, J.G. primarily relies on the video of the incident.[11] The video is not clear enough establish unequivocally that Lingle's actions were reasonable under the circumstances. As a result, I cannot find that Officer Lingle's takedown was reasonable as a matter of law. For example, factual disputes must be resolved regarding how fast-moving and unpredictable the encounter was (or reasonably seemed), whether and to what degree J.G. had become agitated with and threatening to Officer Lingle, whether J.G. tried to strike Officer Lingle and how J.G. injured his eye. As a result, a jury will have to hear the evidence, find facts and resolve this claim with a verdict.

## III. Qualified Immunity

Officer Lingle argues that even if his actions were unconstitutional, he is entitled to qualified immunity, which applies whenever a government official's actions did not violate the "clearly established law" at the time of the incident. *Pearson v. Callahan*, 555 U.S. 223, 243-44 (2009); *Vinning-El v. Evans*, 657 F.3d 591, 594 (7th Cir. 2011). Once a defendant has raised the defense of qualified immunity, the plaintiff has the burden to show that it should not apply. *Mannoia v. Farrow*, 476 F.3d 453, 457 (7th Cir. 2007). At least at this point in the lawsuit, J.G. has met that burden. As explained above, defendants have not established as a matter of law that the amount of force that Officer Lingle used was reasonable under the circumstances.

---

[11] Although J.G. apparently testified about the incident in his deposition, he has not introduced this testimony in support of his claims on summary judgment.

The Court of Appeals for the Seventh Circuit has explained that:

> It is clear . . . that police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever. This Court's decision in *McDonald v. Haskins*, 966 F.2d 292 (7th Cir. 1992), makes that much clear. It is only when the circumstances themselves leave room for the exercise of judgment on the part of the police officer that qualified immunity is appropriate. The police cannot have the specter of a § 1983 suit hanging over their heads when they are confronted with a dangerous fugitive, possible escapee, or as long as their behavior falls within objectively reasonable limits. *See* [*Graham v.*] *Connor*, 490 U.S. [386,] 397; *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982). On the other hand, if the facts draw into question the objective reasonableness of the police action under the alleged circumstances, they must be developed in the district court before a definitive ruling on the defense can be made. *Johnson* [*v. Jones*], 515 U.S. [304, 313-15 (1995)].

*Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996).

In this case, the parties dispute whether and to what extent J.G. posed a threat to Officer Lingle or others at the time of the incident, the amount of force Officer Lingle used and the cause of J.G.'s injuries. Because these factual disputes bear on the objective reasonableness of the force used by Officer Lingle, a trial is required before a determination can be made as to whether Officer Lingle is entitled to qualified immunity. *Chelios v. Heavener*, 520 F.3d 678, 692 (7th Cir. 2008) (finding same in excessive force case). Although I find that Officer Lingle is not entitled to qualified immunity as a matter of law, he may pursue this defense at trial. At that point, this defense must be evaluated in light of the character and quality of the evidence received at trial. *Ortiz v. Jordan*, U.S. (2011) (citing Fed. R. Civ. P. 50(a), (b)) ("After trial, if defendants continue to urge qualified immunity, the decisive question, ordinarily, is whether the evidence favoring the party seeking relief is legally sufficient to overcome the defense.").

16

## IV.  The *Monell* Claim

A local governing body may be liable for monetary damages under § 1983 if the unconstitutional act complained of is caused by:  (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority.  *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (citing *Monell*, 436 U.S. at 690; *Valentino v. Village of S. Chicago Heights*, 575 F.3d 664, 674 (7th Cir. 2009)).  Although J.G.'s argument is unclear, he appears to be bringing the second type of claim, asserting that the city "actively support[s] the excessive use of force on innocent school children."

To demonstrate a harmful custom or practice, J.G. must show that city policymakers were "deliberately indifferent as to [the] known or obvious consequences."  *Id.*  (quoting *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002).  "In other words, they must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff."  *Id.*  A municipality's failure to make a policy to remedy a potentially dangerous practice also may be actionable.  *Id.*  As the Court of Appeals for the Seventh Circuit has explained:

> We do not adopt any bright-line rules defining a "widespread custom or practice."  As we stated in *Cosby v. Ward*, there is no clear consensus on how frequently misconduct must occur to impose *Monell* liability, "except that it must be more than one instance," 843 F.2d 967, 983 (7th Cir. 1988), or even three, *Gable*, 296 F.3d at 538 ("[T]hree incidents where vehicle owners were erroneously told that their vehicles were not at Lot 6 do not amount to a persistent and widespread practice.") (internal quotation marks omitted).  But the plaintiff must demonstrate that there is a policy at issue rather than a random event.  This may take the form of an implicit policy or a gap in expressed policies, *Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006) (citing *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005)), or "a series of violations to lay the premise of

17

deliberate indifference." *Palmer* [*v. Marion County*,] 327 F.3d [588,] 596
[(7th Cir. 2003)](citation omitted).

*Thomas*, 604 F.3d at 303.

J.G. has failed to meet this burden.  In support of his claim, J.G. generally contends that

defendants do not have very much experience dealing with children with developmental delays,

failed to conduct a thorough investigation of Officer Lingle's use of force against J.G. (by not

interviewing J.G. or other students), failed to investigate Officer Lingle's three previous

takedowns of middle-schoolers in one month to examine whether there was a pattern of excessive

use of force and determined that only one out of 30 to 50 uses of force by the Sun Prairie police

was excessive.[12]

As defendants point out, J.G. has not provided any context with respect to the 30 to 50

incidents involving a use of force or Officer Lingle's previous three takedowns.  The undisputed

facts show that the Sun Prairie Police Department investigated all instances involving an officer's

use of force, including the incident between Officer Lingle and J.G., and the department found

no excessive force.  Apart from criticizing the investigation of the incident in the instant case,

J.G. has presented no facts from which a jury could conclude that any of the department's

previous investigations were lacking or that the investigated incidents actually involved use of

excessive force.  J.G. has not described any of the previous incidents or explained whether they

have any correlation to Officer Lingle's actions on February 14, 2013.  Without such evidence,

a reasonable jury could not conclude that there was an obvious problem with excessive force

---

[12] J.G. also mentions that the city failed to provide adequate training to police officers on how
to enforce school policies and honor the rights of students with disabilities.  However, as noted at the
beginning of this opinion, J.G. did not allege a failure to train in his complaint and has not adduced
evidentiary support for this argument apart from the expert opinion of Dr. Chapman.

investigations of which city officials like defendants Murray and Anhalt should have been aware.

Accordingly, defendants City of Sun Prairie, Murray and Anhalt are entitled to summary

judgment with respect to J.G.'s *Monell* claim against them.

ORDER

IT IS ORDERED that:

(1) Defendants' motion for summary judgment, dkt. 21, is GRANTED with respect to the claims against defendants Sun Prairie Police Department, City of Sun Prairie, John Murray and Patrick Anhalt.

(2) Defendants' motion for summary judgment, dkt. 21, is DENIED with respect to qualified immunity and the excessive force claim against defendant Officer Lingle.

(3) The Clerk of Court is directed to dismiss defendants Sun Prairie Police Department, City of Sun Prairie, John Murray and Patrick Anhalt from this case.

Entered this 28th day of August, 2014.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge